IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Samantha Douglas, | ) | C/A No.: 1:09-1349-CMC-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Michael J. Astrue, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

This appeal from a denial of Social Security benefits is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff ("Plaintiff" or "Claimant") brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for supplemental security income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards.

I.      Relevant Background

   A.      Procedural History

   In February 2004, Plaintiff filed an application for SSI under Title XVI of the Act, 42 U.S.C. §§ 1381-1383c. *See* Tr. 62–65. Plaintiff's application was denied initially and on reconsideration. Tr. 48–51, 54–55. After an August 22, 2006 hearing, Administrative Law Judge ("ALJ") Frederick Christian issued a November 2006 unfavorable decision

finding that Plaintiff was not disabled within the meaning of the Act. Tr. 240–73 (hr'g tr.), Tr. 28–36 (Nov. 2006 ALJ decision). The Appeals Council granted Plaintiff's request for review and remanded the case to the ALJ for further consideration of Plaintiff's mental impairments. Tr. 209–12. On remand, the ALJ ordered a consultative psychological examination. Tr. 229–34. At a June 12, 2008 supplemental hearing, the ALJ heard testimony from Plaintiff, her mother Elizabeth Douglas, medical expert ("ME") Nathan R. Strahl, M.D., and vocational expert ("VE") Luther D. Pearsall, Ph.D. Tr. 274–323. In an October 15, 2008 decision, the ALJ again found that Plaintiff was not disabled within the meaning of the Act. Tr. 16–27. The Appeals Council denied her request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. 8–11. *See* 20 C.F.R. § 416.1481. Plaintiff then filed this appeal.

B.     Plaintiff's Background and Medical History

Born in 1969, Plaintiff completed the eighth grade and has no past relevant work experience. Tr. 259. She applied for SSI, alleging she could not work because of paranoid schizophrenia. Tr. 71.

Plaintiff has not disputed the Commissioner's recitation of her medical history set out in the Commissioner's Memorandum. *See* Entry #16. Therefore, the undisputed medical evidence as stated by the Commissioner is set forth herein.

1.     Medical History

In November 2003, after an allegation of child neglect, Plaintiff was referred to Robert Noelker, Ph.D., by the Department of Social Services ("DSS") to "assess

[Plaintiff's] current intellectual, academic, and personality characteristics, and to relate these to her ability to protect and parent her minor children." Tr. 117–21. On exam, Plaintiff was neatly, cleanly, and casually dressed and her speech was relevant and coherent. Tr. 118. Dr. Noelker "could find no evidence for the presence of hallucinations or delusions . . . . There is no evidence for psychosis or a thought disorder." Tr. 118. He administered the Wechsler Abbreviated Scale of Intelligence; Plaintiff attained a full scale IQ of 72, demonstrating borderline intellectual functioning. Tr. 118. Dr. Noelker diagnosed her with neglect of child, cannabis dependence, narcissistic personality disorder, and borderline intellectual functioning. Tr. 119.

In January 2004, Plaintiff went to the emergency room because she had been hearing voices for several weeks. Tr. 123. She was diagnosed with paranoid schizophrenia and admitted to the emergency room for observation. Tr. 123. A toxicology screen was positive for marijuana. Tr. 132.

Two days later, Plaintiff was moved to the psychiatric ward of Palmetto Baptist Hospital. Tr. 137. Samy L. Tawfik, M.D., noted that Plaintiff "ha[d] been drinking and using cocain[e] quite a bit prior to admission" and had been paranoid and having delusions for the past two weeks. Tr. 140. She tested positive for marijuana and "was placed on alcohol withdrawal scale and did score high enough to be given Valium."[1] Tr. 140. She "admitted that she only [had] problems after starting using cocain[e] and marijuana and

_____

[1] As annotated in the Commissioner's brief, "[v]alium is used to treat acute alcohol withdrawal." Def.'s Br. 3 n.2 (citing *Physicians' Desk Reference* 3047–48 (56th ed. 2002)).

increased use of alcohol." Tr. 140. On discharge, Plaintiff was in good physical and stable psychiatric condition. Tr. 140. She was diagnosed with cannabis-induced psychotic disorder, cannabis abuse, and possible cocaine and alcohol abuse, and received a global assessment of functioning (GAF) score of 50, which is indicative of serious symptoms or any serious impairment in social, occupational, or school functioning.[2] Tr. 140–41.

In June 2004, psychiatrist Bonnie Ramsey, M.D. examined Plaintiff at the request of the state agency. Tr. 143–46. Plaintiff reported she dropped out of school in the ninth grade and worked as a housekeeper "several years ago for about one month[,]" but quit the job because of transportation problems. Tr. 143. She reported using marijuana from age twelve until age twenty and alcohol from age seventeen until twenty. Tr. 144. In speaking with Dr. Ramsey, she initially denied cocaine use. When questioned further about her statements to Dr. Tawfik about cocaine use, "she then said well maybe she had [used cocaine]." Tr. 144. She continued to complain that she was hearing voices. Tr. 144. Dr. Ramsey diagnosed Plaintiff with probable substance-induced psychotic disorder, cocaine and cannabis abuse, history of alcohol abuse, possible mental retardation, and assessed a GAF score of 50. Tr. 146.

In July 2004, Samuel Goots, Ph.D., a state agency psychologist, completed a mental residual functional capacity ("RFC") assessment, opining that Plaintiff had several

_____

[2] The Commissioner provides the following reference regarding the significance of specific GAF scores: Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed. text revision 2000) (*DSM-IV*), *available at* Stat!Ref. *See* Def.'s Br. 3, n.3, 4, n.4.

moderate limitations. Tr. 149–50. Dr. Goots also completed a psychiatric review technique form setting out these findings. *See* Tr. 153–65.

In July 2004, psychiatrist Milagros Valentin, M.D., who had treated Plaintiff since April 2004, opined that Plaintiff had "baseline paranoia and auditory hallucinations" and sometimes self-medicated with cannabis "with poor results." Tr. 168. He further opined that she was "unable to care for herself or her children due to her mental illness and borderline intellectual functioning." Tr. 168. In September, he completed a medical source statement, opining that she had "no" to "poor" ability to perform all mental work activities. Tr. 169–71.

In April 2005, J.P. Ginsberg, Ph.D., examined Plaintiff at the state agency's request. Tr. 172–75. Plaintiff told Dr. Ginsberg that she had been hearing voices for two or three years. On examination, though, he noted that Plaintiff had evaded a reality-testing question and there were no "frank signs of delusional thought or obsessive behaviors." Tr. 172–73. She claimed she had last used marijuana one year before and cocaine two years before that 2005 examination. Tr. 174. Dr. Ginsberg diagnosed Plaintiff with cannabis and cocaine abuse or dependence, possibly in remission, and schizotypal personality, and assigned a GAF score of 55, which is indicative of moderate symptoms or moderate difficulty in social, occupational, or school functioning. Tr. 174. Dr. Ginsberg also noted that Plaintiff's "unreliable" reports of cocaine abuse were "troubling." His notes indicate that a previous report "suggests cocaine usage one year ago, but the claimant is reporting that two years have passed since she last used cocaine." Tr. 174. Further, Plaintiff's

"cognitive disorientation [was] . . . extreme and suggestive of exaggeration of those deficits." Tr. 174. His "best guess" was that Plaintiff's social interaction and concentration were moderately impaired, her activities of daily living and interests were "mildly or not at all limited," and her ability to perform work-related tasks was likely poor. Tr. 175.

In May 2005, Edward Waller, Ph.D., a state agency psychologist, completed a mental RFC assessment, opining that Plaintiff has several moderate impairments. Tr. 180–82. He also completed a psychiatric review technique form. Tr. 183–96.

On August 31, 2006, Dr. Valentin provided an addendum to his July 2004 opinion in which he stated that Plaintiff's "diagnosis and presentation remains unchanged . . . except that she is no longer using cannabinoids. . . . She is still unable to care for herself or her children due to her mental illness and borderline intellectual functioning." Tr. 205.

In May 2008, after the Appeals Council remanded this case to the ALJ, A. Nicholas DePace, Ph.D., evaluated Plaintiff. Tr. 229–34. She reported to Dr. DePace that her basis for her disability claim was that she hears voices and has a third-grade level of education. Tr. 229. At that time, she was not involved in counseling and had not taken psychotropic medications for the previous two years. Tr. 230. Plaintiff denied alcohol or marijuana use at the time of the May 2008 examination, but admitted that she "had patterns of significant alcohol intake in the past." Tr. 231. She also indicated that she used marijuana "significantly and extensively up until a year ago." Tr. 231.

Plaintiff told Dr. DePace that she hears voices and "heard them consistently throughout this evaluation here today." Tr. 231. Dr. DePace noted, though, that there was "no evidence that she was attempting to attend to any type of internal or external process that she may be experiencing." Tr. 231. Dr. DePace also noted that, throughout the evaluation, Plaintiff "clearly engaged in numerous behaviors that strongly suggested that she was not putting forth appropriate effort with regard to questions asked of her regarding intelligence and achievement functioning as well as cognitive functioning overall." Tr. 231. Dr. DePace administered Plaintiff an intelligence test, and she obtained a full scale IQ of 46. Tr. 232. Dr. DePace noted, however, that "in no way these scores are felt to be an accurate assessment of her true ability." Tr. 232.

Dr. DePace diagnosed Plaintiff with auditory hallucinations and paranoia, "although she had not been on any type of antipsychotic for at least 2 years," malingering, and possible alcohol, marijuana, and other substance use, "although [she] denied at this time." Tr. 233. Dr. DePace concluded that "[d]ue to [Plaintiff's] clear attempts to portray herself as quite impaired during this evaluation, conclusions regarding her ability to actually perform activities of daily living, to relate effectively to others, to manage her own funds, to tolerate frustration, to perform 3-step command[s] and to concentrate are not able to be reliably given at this time." Tr. 233.

2.      Administrative Hearing Testimony

a.      ME Testimony

During the June 2008 administrative hearing, ME, psychiatrist Nathan Strahl, M.D., testified, responded to questions from the ALJ, and questioned Plaintiff. Tr. 213, 282–95. Based on his review of the record and questioning of Plaintiff, Dr. Strahl diagnosed Plaintiff with schizophrenia paranoid type or schizoid personality disorder, borderline intellectual functioning, and alcohol, marijuana, and cocaine use. Tr. 288–89. He opined that up through 2006, Plaintiff met several listings—12.02, 12.03, 12.08, and 12.09—and that Plaintiff's drug and alcohol use was material to her meeting the listings. Tr. 290, 292, 293. Without alcohol or drug use, he opined, Plaintiff could perform simple, repetitive, and routine tasks in a non-production setting, provided that she did not have to extensively interact with the public. Tr. 291. She would need "to be given a single task, report to a single supervisor [and] work more on her own pace." Tr. 291.

b.      Testimony of Plaintiff and her Mother

Plaintiff testified that she lived with her parents and that she has two children, one of whom also lives with her parents. Tr. 298, 300. She testified that she spent her day watching soap operas. She quit school in the ninth grade because she was going to be held back a year. Tr. 301. She testified that although she stopped using drugs and alcohol, she still heard voices. Tr. 301. She indicated that she was not taking any medications. Tr. 304.

Plaintiff's mother testified that Plaintiff had lived with her for six years and that she had had custody of Plaintiff's children for five years at the time of the hearing. Tr. 308. According to Plaintiff's mother, Plaintiff did not help with the house work or help care for the children. Tr. 309.

### c. VE Testimony

VE Dixon Pearsall, Ph.D. testified in response to a series of hypothetical questions posed by the ALJ. One question concerned an individual of Plaintiff's age, education, and work experience who was capable performing routine, repetitive single step, unskilled work with a specific vocational preparation ("SVP") rating of 1 or 2, must be able to work on only one task, work at her own pace, and report to only a single supervisor, and had no interaction with the general public. Tr. 316–317. In response, the VE testified that the hypothetical individual could work at the following jobs: a sorter (3,000 jobs in South Carolina and 90,000 nationally), light work with an SVP of 2; small parts assembler (4,500 jobs in South Carolina and 130,000 nationally), light work with an SVP of 2; and hand packer (7,000 jobs in South Carolina and 210,000 nationally), medium work with an SVP of 2. Tr. 317. The VE further testified that his testimony was consistent with the Dictionary of Occupational Titles (DOT). Tr. 317–18.

### C. The ALJ's Decision

The ALJ followed the five-step sequential evaluation process set forth at 20 C.F.R. § 404.1520 in determining that Plaintiff was not disabled. Tr. 16–27. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her February 2004

application date.  Tr. 19.  At step two, the ALJ found that Plaintiff had the following severe impairments from February 2004 through December 31, 2006: paranoid schizophrenia, schizoid personality disorder, borderline intellectual functioning, drug abuse, and alcoholism.  Tr. 19.  The ALJ then found that Plaintiff met the presumptively disabling listings from February 2004 until December 2006.  Tr. 19.  Beginning after December 2006, the ALJ concluded that Plaintiff stopped her substance use, no longer met the listings, and retained the RFC to perform work at all exertional levels but was limited to "unskilled work with a SVP of 1, in a low stress environment, and with no public contact."  Tr. 20–21.  At step five, the ALJ found that Plaintiff could perform the requirements of occupations such as sorter, assembler, and hand packer.  Tr. 26–27. Because Plaintiff was no longer disabled once she stopped her substance use, the ALJ concluded that her drug and alcohol use was material to the finding of disability.  *See* 42 U.S.C. § 1382c(a)(3)(J) ("[A]n individual shall not be considered to be disabled for purposes of this title if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled.").  Accordingly, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act.  Tr. 27.

II.    Discussion

In her brief, Plaintiff argues that the Commissioner's findings are in error for the following reasons:

1) the Commissioner failed to meet his burden of establishing there is work that Plaintiff could perform; and

2) the ALJ did not properly assess and evaluate the opinion of Plaintiff's treating psychiatrist, Dr. Milagros Valentin.

The Commissioner counters that substantial evidence supports the ALJ's findings.

A.    ALJ Findings

In his October 15, 2008 decision, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since February 4, 2004, the alleged onset date (20 CFR 416.920(b) and 416.971 *et seq.*).

2.    From February 4, 2004, the claimant's alleged onset date, through December 31, 2006, she had the following severe impairments: paranoid schizophrenia, schizoid personality disorder, borderline intellectual functioning, drug abuse and alcoholism (20 CFR 416.920(c)).

3.    From February 4, 2004, through December 31, 2006, the claimant's impairments, including the substance use disorders, met sections 12.02, 12.03,12.08, and 12.09 of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d)).

4.    After December 31, 2006, which is the point when the claimant stopped her substance use, the claimant has had the severe impairments of paranoid schizophrenia, schizoid personality disorder, borderline intellectual functioning, and a history of drug abuse and alcoholism.

5.  After December 31, 2006, the claimant has not had an impairment or combination of impairments that meet or medically equal any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d)).

6.  After December 31, when the claimant stopped her substance use, she has had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: limited to unskilled work with a SVP of 1, in a low stress environment, and with no public contact.

7.  The claimant has no past relevant work (20 CFR 416.965).

8.  The claimant was born June 15, 1969, and was 34 years old, which is defined as a younger individual age 18–49, on the date the application was filed (20 CFR 416.963).

9.  The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

10. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

11. After December 31, 2006, when the claimant stopped her substance use, considering her age, education, work experience, and residual functional capacity, there would be a significant number of jobs in the national economy that the claimant could perform (20 CFR 416.960(c) and 416.966).

12. Because the claimant is not disabled once she stopped the substance use (20 CFR 416.920(g)), the claimant's substance abuse disorders are a contributing factor material to the determination of disability (20 CFR 416.935). Thus, the claimant has not been disabled within the meaning of the Social Security Act at any time from the date the application was filed through the date of this decision.

Tr. 19–21, 26–27.

B.  Legal Framework

1.  The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines "disability" as follows:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of "disability" to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1; (4) whether such impairment prevents claimant from performing past relevant work; and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant "disabled or not

disabled at a step," Commissioner makes determination and "do[es] not go on to the next step.").

A claimant is not disabled within the meaning of the Act if she can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling (SSR) 82–62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to past relevant work, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to past relevant work. *Id.* If the Commissioner satisfies its burden, the claimant must then establish that she is unable to perform other work. *Id.; see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

2.      The Court's Standard of Review

The Social Security Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the

Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 428 F.2d 1157, 1157–58 (4th Cir. 1971); s*ee Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perales*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek v. Finch*, 428 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C.    Analysis

   1.    Substantial Evidence Supports the ALJ's Finding Regarding Work Plaintiff Could Perform.

Plaintiff's first allegation of error is that the Commissioner's decision that there exists work in the national economy that Plaintiff could perform is not supported by

substantial evidence.  Specifically, Plaintiff that argues the hypothetical questions the ALJ

asked the VE were flawed because they did not match the RFC findings the ALJ set out

for Plaintiff in his decision.  This error, Plaintiff argues, prevents the Commissioner from

meeting his burden of proving that jobs exist in the national economy that Plaintiff could

perform despite the restrictions the ALJ found to exist on Plaintiff's capacity to work.

Pl.'s Br. 20–25.

> In his decision, the ALJ found Plaintiff's RFC as follows:

> full range of work at all exertional levels but with the following
> nonexertional limitations: limited to **unskilled work with a SVP of 1**, **in a**
> **low stress environment**, and with no public contact.

Tr. 21 (emphasis added).  Plaintiff's challenges focus on two portions of this finding.

First, she argues the finding she is limited to unskilled work  "with a SVP of 1" is not

supported by the questioning of the VE.  Second, she argues the ALJ's questioning of the

VE did not appropriately convey what a "low stress environment" was.  *See* Pl.'s Br.

22–24.

> The first hypothetical question the ALJ asked of the VE follows:

> I am going to determine that based on the testimony and evidence we have
> that Ms. Douglas has no past relevant work in that although she may have
> worked, it was not long enough to be considered relevant for Social Security
> purposes so I'm going to ask you to assume hypothetically an individual
> with no work history who is a younger individual with a marginal education,
> who has a diagnoses of paranoid schizophrenia, schizoid personality
> disorder, borderline intellectual functioning, and a history of substance
> abuse. And assume that these impairments in combination **limit her to the**
> **performance of routine, repetitive single step tasks as in unskilled work.**
> **That is work with an SVP of 1 or 2**. However, she must be able to perform
> these tasks in a work setting where she, as I said, **works only on a single**

**task at a time, is able to work at her own pace, and reports only to a single supervisor. Further, she would work in a setting where she has no interaction with the general public in performance of her job duties**.

Tr. 316–17 (emphasis added).

After confirming with the ALJ that the hypothetical question would not include any exertional limitations, the VE testified that there would be unskilled work available for the individual described in the hypothetical. Tr. 317. At the ALJ's request, the VE then listed some of the available jobs and their approximate numbers in the economy:

> One would be that of a sorter, DOT code 789.687-146. It is at the light exertional level, SVP of 2. There are approximately 3,000 such positions in the South Carolina economy [and] in excess of 90,000 in the U.S. economy and another position would be that of an assembler. It's also called a small parts assembler or a table assembler, meaning you're working at a table, not [INAUDIBLE] tables. DOT code of 712.687-010. It is light with an SVP of 2. There are approximately 4,500 positions in the South Carolina economy; in excess of 130,000 in the U.S. economy. And another position would be that of a hand packer or packager. The DOT code is 920.587-018. It's medium, SVP of 2. There are approximately 7,000 such positions in the South Carolina economy; in excess of 210,000 in the U.S. economy.

Tr. 317.

Plaintiff argues that because the ALJ's decision limits Plaintiff's RFC to "unskilled work with a SVP of 1," (Tr. 21), and because all of the jobs the VE and the ALJ indicated Plaintiff could still perform have an SVP of 2, the Commissioner's finding that there are jobs Plaintiff could perform at her RFC level is not supported by substantial evidence. She argues that the impact of her nonexertional limitations on the "remaining, very narrow range of work (SVP level 1 occupations) is entirely speculative without vocational testimony." Pl.'s Br. 23.

In response, the Commissioner argues that the ALJ's decision is supported by substantial evidence. The Commissioner concedes that the ALJ's finding that Plaintiff is limited to work with an "SVP of 1" is contrary to the question the ALJ posed to the VE regarding unskilled work with an SVP of 1 or 2. However, the Commissioner argues that the limiting Plaintiff to work with an "SVP of 1" was an obvious scrivener's error and that, when viewing the record evidence and testimony, the RFC intended by the ALJ is reasonably interpreted as "unskilled work with a SVP of 1 or 2." Def.'s Br. 10–11.

The court agrees with the Commissioner. In reviewing the record as a whole, the court finds the ALJ's omission of work with an SVP of 2 in his RFC finding was a drafting error and is no cause for remand.

At the hearing, the ALJ asked the VE a hypothetical question that included the following nonexertional requirement: impairments limit Plaintiff to the "performance of routine, repetitive single step tasks as in unskilled work. That is work with an SVP of 1 or 2." Tr. 316. It is undisputed that the jobs the VE identified at the hearing—that of sorter, assembler, and hand packer—all have an SVP of 2. *See* Tr. 317. In his decision, the ALJ describes his hypothetical questions to the VE as regarding whether jobs would exist for "an individual with the claimant's age, education, work experience, and the residual functional capacity the claimant would have if she stopped the substance use." Tr. 27. He then recounts the VE's response and lists the jobs of sorter, assembler, and hand packer and notes that the VE's testimony regarding these positions is consistent with information in the Dictionary of Occupational Titles. Tr. 27.

If the ALJ had intended to restrict Plaintiff to jobs with an SVP of 1, it would not have been logical for him to list the jobs that have an SVP of 2 as work the VE testified someone with the RFC assigned to Plaintiff could perform. Although the wording in finding 6 (Tr. 21) is technically inconsistent with the VE's testimony that Plaintiff could perform jobs with an SVP of 2, the context of the decision indicates the omission of "SVP of 2" from finding 6 was a drafting error, not grounds for remand or reversal. *See, e.g., Moore v. Astrue*, 06-3514-HFF, 2008 WL 216605 (D.S.C. Jan. 24, 2008) (rejecting plaintiff's claim of error when ALJ inadvertently listed depression as severe impairment in finding, but analyzed it in detail as nonsevere impairment in body of decision); *see also Dean v. Astrue*, C/A No. 5:08-78, 2009 WL 2883013, at *27 n.9 (N.D. W. Va. Sept. 2, 2009) (rejecting plaintiff's claim of error regarding plaintiff's RFC as including a "cut-and-paste error" and the court's imposing its "reasonable interpretation" on the RFC assessment based, in part, on ALJ's questioning of the VE).

Further, the record supports the ALJ's intention to find Plaintiff's RFC includes unskilled jobs with an SVP of 1 or 2. Dr. Strahl testified that Plaintiff could perform simple, repetitive, and routine tasks in a non-production setting. Tr. 291. This opinion of Plaintiff's mental abilities is consistent with unskilled work, which "is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568(a). Unskilled work generally requires an ability to understand, remember and carry out simple instructions, make simple work-related decisions, respond appropriately to supervision, and deal with changes in a routine work

setting. SSR 96-9p, 1996 WL 374185, at *9. Both SVP 1 and SVP 2 jobs are unskilled (SSR 00-4p, 2000 WL 1898704, at *3), as the ALJ acknowledged in his questioning of the VE. *See* Tr. 316 (ALJ hypothesizing limit to "performance of routine, repetitive single step tasks as in unskilled work. That is work with an SVP of 1 or 2.")

Further, as pointed out by the Commissioner on page 11 of his brief, the DOT's explanation of work with an SVP of 1 and 2 indicate that the only difference in the two SVP levels is the amount of time it takes the typical worker to become proficient. *See Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles*, app'x B. SVP 1 jobs require only a "short demonstration," and SVP 2 jobs require anything beyond a "short demonstration" and time "up to and including 1 month." *Id.* Here, nothing in any doctor's notes supports restricting Plaintiff to only SVP 1 jobs.

The undersigned recommends finding that the ALJ's finding number 6 is reasonably interpreted as imposing the following nonexertional RFC limitations on Plaintiff: "limited to unskilled work with a VP of 1 or 2, in a low stress environment, and with no public contact." Plaintiff's first challenge to the ALJ's finding there are jobs in the national economy she could perform is without merit.

Plaintiff also specifically claims error based on the ALJ's hypothetical limitation explained to the VE as working "on a single task at a time," "at her own pace, and report[ing] only to a single supervisor[,]" and having "no interaction with the general public in performance of her job duties[.]" *See* Tr. 316–17. Plaintiff argues those

restrictions are not the same as the ALJ's finding number 6 that Plaintiff would be restricted to work "in a low stress environment, and with no public contact." Pl.'s Br. 23–25. Plaintiff focuses specifically on the interpretation of what constitutes "low stress work" and how it would interact with the "SVP 1 restriction" in impacting the jobs Plaintiff could perform, claiming this decision is "entirely the province of vocational testimony." Pl.'s Br. 23–24. Plaintiff requests that her case be "remanded for vocational testimony as to the impact of the restrictions actually found by the ALJ on [her] occupational base of work." Pl.'s Br. 25.

The Commissioner responds that the testimony elicited from the VE provides sufficient evidence to support the ALJ's findings regarding work that Plaintiff can perform. Specifically, the Commissioner argues that the conditions the ALJ expressed in ' hypothetical to the VE may appropriately be considered as being limited to Plaintiff's RFC of working in a low-stress environment without exposure to the general public. Def.'s Br. 11–12.

The court agrees with the Commissioner. As an initial matter, part of Plaintiff's argument about the "low-stress" restriction's being defined is how the "low-stress" restriction would relate to jobs at the SVP-1 level only. *See* Pl.'s Br. 23–24. The court does not agree that the ALJ intended to restrict the available jobs to those at the SVP-1 level, as discussed above. Accordingly, the court finds that portion of Plaintiff's claim of error regarding the "low-stress" restriction on her RFC to perform work to be without merit.

Further, the court does not agree with Plaintiff's argument that it is impossible to know whether the VE would define low stress as including the precise limitations the ALJ imposed on Plaintiff's RFC in his decision. For example, Plaintiff creates her own suggestion that, perhaps the VE would consider a "low-stress" restriction to "require no production work at all[,]" and then suggests that the jobs identified by the VE "by their definition would require some production quota to be met." Pl.'s Br. 24. However, Plaintiff offers no support for that argument. In any event, the court finds that the ALJ's restriction of having a job in which Plaintiff could "work at her own pace" would be consistent with a position that did not require Plaintiff to meet any production quota.

Additionally, other courts that have considered what a "low-stress job" is have found it to be one that involves simple, routine tasks. *See Menkes v. Astrue*, 262 F. App'x 410, 412 (3d Cir. 2008) (unpublished) ("For example, performing a 'simple routine task' typically involves low stress level work that does not require maintaining sustained concentration."); *Bradley v. Barnhart*, 175 F. App'x 87, 89 (7th Cir. 2006) (unpublished) ("[T]he ALJ posed a hypothetical question in which he asked if an individual with Bradley's medical condition could perform 'simple, routine, repetitive, low-stress work.' The VE replied yes. After Bradley's counsel interjected that the term 'low-stress work' was 'unclear,' the VE clarified that he defined the term to mean '[o]ne- and two-step jobs.'").

Although the ALJ's wording of the hypothetical question did not verbatim follow the RFC limitation he set out, he conveyed to the VE the conditions he found Plaintiff's

impairments imposed on her RFC. The ALJ enjoys "some discretion to craft hypothetical questions to communicate to the vocational expert what the claimant can and cannot do." *Fisher v. Barnhart*, 181 F. App'x 359, 364 (4th Cir. 2006) (unpublished opinion) (finding hypothetical question appropriately conveyed RFC limits to VE).

Here, the ALJ's questions to the VE fairly indicate Plaintiff's RFC the ALJ found her to have. The VE's testimony provides substantial evidence that there exist jobs in the national economy that Plaintiff could still perform given the RFC the ALJ set out.

Plaintiff's allegation of error on this point is without merit. The RFC limitation that Plaintiff could only perform low stress jobs is consistent with the hypothetical question to the VE finding Plaintiff capable of working one task at a time, at her own pace, and reporting only to a single supervisor. Tr. 316.

The record includes substantial evidence to support the ALJ's finding that there exist in the national economy jobs that, considering her RFC found by the ALJ, Plaintiff could perform. Plaintiff's first allegation of error should be dismissed.

2.  The ALJ Appropriately Assessed and Evaluated the Opinion of Plaintiff's Treating Psychiatrist.

Plaintiff's other allegation of error is that the ALJ erred by not giving appropriate weight to the opinion of her treating psychiatrist, Dr. Milagros Valentin, and that the ALJ did not provide sufficient reasons or explanation for giving that opinion "partial weight," and how that translated to the RFC the ALJ gave Plaintiff. *See* Pl.'s Br. 27–31. Plaintiff also complains that the ALJ should have obtained additional information from Dr.

Valentin and erred by rejecting his opinion without seeking additional information from him. *Id.* at 30.

The Commissioner counters that the ALJ appropriately considered and discounted portions of Dr. Valentin's opinion and that the ALJ properly explained and documented the reasons for his findings relating to Dr. Valentin's opinion. Further, the Commissioner argues the decision to discount Dr. Valentin's findings is supported by substantial record evidence and that there was no need for the ALJ to seek additional information from Dr. Valentin. Def.'s Br. 13–16.

SSR 96-2p provides that if a treating source's medical opinion is "well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight[.]" *See also* 20 C.F.R. § 404.1527(d)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and inconsistent with other substantial evidence in the record); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding a physician's opinion should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence). When assessing a treating source's opinion, the ALJ shall consider the factors in 20 C.F.R. §§ 404.1527(d)(2) through (d)(6). However, determinations regarding whether a claimant is "disabled" and related legal conclusions are administrative determinations for the Commissioner and not for medical personnel. 20 C.F.R. § 404.1527(e) (noting certain

opinions by medical sources—such as being "disabled" or "unable to work"—are not afforded "special significance").

The Fourth Circuit has set forth the following considerations for an ALJ when weighing and evaluating medical opinions: "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006); *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005); 20 C.F.R. § 404.1527(d). The rationale for the general rule affording opinions of treating physicians greater weight is "because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." *Johnson*, 434 F.3d at 654 (*quoting Mastro v. Apfel,* 270 F.3d 171, 178 (4th Cir. 2001)). An ALJ, though, can give a treating physician's opinion less weight "in the face of persuasive contrary evidence." *Mastro*, 270 F.3d at 178. Further, in undertaking review of the ALJ's treatment of Plaintiff's treating physician, the court remains mindful that its review is focused on whether the ALJ's opinion is supported by substantial evidence and that its role is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Craig*, 76 F.3d at 589.

In Dr. Valentin's July 22, 2004 letter regarding Plaintiff, he indicated he had treated Plaintiff since April 21, 2004 and that it was his opinion that Plaintiff was "unable to care for herself or her children due to her mental illness and borderline intellectual

functioning." Tr. 205. In that letter, sent "To Whom It May Concern," Dr. Valentin also noted that Plaintiff had "been known to self-medicate with cannabis in order to alleviate her symptoms with poor results." *Id.* In September 2004, Dr. Valentin completed a Medical Source Statement in which he opined that Plaintiff's abilities were either "poor" or "none" in most instances. *See* Tr. 169–71.

The August 31, 2006 addendum to Dr. Valentin's July 22, 2004 letter provided that Plaintiff's "diagnosis and presentation remains unchanged" from the July 22, 2004 letter "except that she is no longer using cannabinoids" and had gained weight. The addendum further states that Plaintiff "is still unable to care for herself or her children due to her mental illness and borderline intellectual functioning." *Id.*

In his decision, the ALJ provided the following detail regarding Dr. Valentin's treatment of Plaintiff, his opinions, and the ALJ's rationale for the weight he gave Dr. Valentine's opinions:

> The claimant has been treated by Dr. Milagros Valentin, of Columbia Psychiatric Associates, from April 2004 through at least August 2006 (Exhibits 6F, 7F, 11F and 12F). As mentioned· earlier in the decision, in July 2004, Dr. Valentin indicated in a letter "to whom it may concern" that it was his professional opinion that the claimant was currently unable to care for herself or her children due to her mental illness and borderline intellectual functioning. Dr. Valentin stated that the claimant has been known to self-medicate with cannabis (Exhibit 6F). In a Medical Source Statement completed in September 2004, Dr. Valentin indicated severe symptoms including auditory hallucinations that interfere with her ability to concentrate, make good judgment and interact with others. He again stated that the claimant was unable to care for herself or her children (Exhibits 7F and 11 F).

In August 2006, Dr. Valentin provided an addendum to his July 2004 letter. He stated that the claimant's diagnosis and presentation remain unchanged from the letter written in July 2004 except that the claimant was no longer using cannabinoids (Exhibit 12F). Dr. Valentin did not state why he thought the claimant was not longer using cannabinoids (such as from the claimant's report or from actual drug tests); and he also did not report on the claimant's other substance abuse including cocaine and alcohol.

The opinion of a treating physician is entitled to great weight unless there is persuasive contradictory evidence. *Coffman v. Bowen*, 829 F. 2d 514 (4th Cir. 1987). While Dr. Valentin has recognized part of the claimant's substance abuse, specifically her use of marijuana, he has failed to discuss the claimant's other substance abuse of cocaine and alcohol. He attributes the claimant's symptoms primarily to her mental illness and borderline intellectual functioning but fails to account for the effect of her substance abuse on her impairments and limitations. In addition, records from Dr. Valentin are limited to the July 2004 letter, a medical source statement and an addendum to the July 2004 letter. There are no treatment notes to support Dr. Valentin's statements that the claimant's mental illness and borderline intellectual functioning cause her symptoms. In addition, Dr. Valentin has not had the benefit of the overall record which has shown numerous inconsistencies of the claimant's part concerning her reported substance abuse, which significantly reduces her credibility concerning her mental symptoms. Finally, as will be discussed below, at the May 2008 consultative examination, the claimant attempted to make her cognitive functioning and her mental health status appear significantly worse that what it actually was. Dr. DePace, the consultative examiner, made numerous statements concerning the claimant's lack of effort and actually diagnosed her with malingering.

For these reasons, while I have considered Dr. Valentin's findings and conclusions, I have given them partial weight.

Tr. 24.

The ALJ detailed four separate reasons for not finding Plaintiff disabled in accordance with Dr. Valentin's opinion. Plaintiff reviews these reasons, arguing that none of them suffices.

The ALJ first explained he gave Dr. Valentin's findings only partial weight because Dr. Valentin did not mention Plaintiff's use of substances other than marijuana and that his findings as to Plaintiff's abilities do not indicate the effect of her substance abuse on her limitations. Tr. 24. Plaintiff argues that such consideration was not relevant regarding Dr. Valentin's "opinion after 2006, as the ALJ found after this date any prior abuse was not a material factor contributing to her disability." Pl.'s Br. 29 (*citing* Tr. 19).

Defendant counters that the ALJ's focus on the record as a whole and comparing it to Dr. Valentin's opinion is appropriate. Def.'s Br. 14–16. The court agrees. *See Craig*, 76 F.3d at 590 ("[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.").

As pointed out by the Commissioner, the record contains specific evidence that Plaintiff continued to use marijuana well after August 31, 2006, when Dr. Valentin indicated Plaintiff was no longer using that substance. For example, in May 2008, Plaintiff told Dr. DePace that she had continued to use marijuana "significantly and extensively up until a year ago," which would have been May 2007—some nine months after the date of Dr. Valentin's last opinion. *Compare* Tr. 231 *with* Tr. 205.

The ALJ found that, as of December 31, 2006, Plaintiff's prior substance abuse was not a material factor contributing to her ability to work. Tr. 21, 26. Plaintiff argues that this finding makes Dr. Valentin's failure to discuss Plaintiff's use of substances other than marijuana irrelevant "in regard to Dr. Valentin's opinion after 2006[.]" Pl.'s Br. 29. The

court does not agree. The ALJ is to consider the record as a whole in determining the weight to afford evidence. In particular, it is appropriate for the ALJ to discount an opinion of a treating physician if it is not supported by sufficient record evidence. *Craig*, 76 F.3d at 590.

Here, Dr. Valentin's August 31, 2006 opinion was issued four months prior to the date the ALJ found substance abuse irrelevant to the analysis of Plaintiff's abilities. Further, the 2006 portion of his opinion is comprised of two sentences only. *See* Tr. 205. Other than the finding regarding Plaintiff's "no longer using cannabinoids," though, Dr. Valentin's opinion refers back to his July 2004 opinion in full. *See id.* The ALJ's measured consideration of Dr. Valentin's focus on Plaintiff's abuse of marijuana and his failure to ever address her abuse of cocaine or alcohol was appropriate when considering the record as a whole.

The same analysis applies to the ALJ's explaining that he discounted Dr. Valentin's opinion in part because the doctor "did not have the benefit of the overall record which has shown numerous inconsistencies" regarding Plaintiff's reported substance abuse and Dr. Valentin's not having the benefit of Dr. DePace's May 2008 consultive examination. Tr. 24. As the ALJ indicated, the record contains numerous inconsistent statements from Plaintiff herself about her drug and alcohol use. In addition to the statement to Dr. DePace referenced above, consider Plaintiff's response to questioning from Dr. Ramsey. Tr. 144. She initially told her she had not used cocaine. However, when pressed about her statements to Dr. Tawfik about her cocaine use, she indicated that "maybe she had [used

cocaine]." Tr. 144. *See also* Tr. 174 (Dr. Ginsberg's reporting he found Plaintiff's "unreliable" reports about cocaine abuse "troubling").

The ALJ's noting that he would not afford Dr. Valentin's opinion full weight because he had not been able to review the May 2008 consultative examination by Dr. DePace, too, was also proper. Consideration of Dr. DePace's opinion, when compared with Dr. Valentin's, reveals it was appropriate for the ALJ to discount Dr. Valentin's finding.

Dr. Valentin's opinion was based, in part, on Plaintiff's intellectual functioning. Tr. 168, 205. Specifically, he indicated that she might be mildly mentally retarded and that her thought processes were slow and impaired, and he concluded that she was "very limited intellectually." Tr. 169–170. Dr. DePace, though, specifically considered Plaintiff's intelligence and diagnosed her as a malingerer because she did not put forth appropriate effort with regard her intelligence, achievement functioning, and cognitive functioning overall. Tr. 231. Dr. DePace also found that Plaintiff had tried to portray herself as "quite impaired" during his evaluation of her. Tr. 233. Dr. Ginsberg's April 2005 opinion that he found Plaintiff's cognitive disorientation to be so severe it suggested "exaggeration" (*see* Tr. 174) bolsters Dr. DePace's malingerer diagnosis.

Additionally, Dr. Valentin's opinion focused on Plaintiff's auditory hallucinations. Tr. 168–70, 205. In regard to the claimed hallucinations, though, Dr. DePace commented that there was "no evidence that she was attempting to attend to any type of internal or external process that she may be experiencing." Tr. 231. He also found "no evidence of

any disordered thoughts . . . and [Plaintiff's] thinking [was] free of circumstantial, tangential and disorganized thinking." Tr. 231. Again, Dr. Ginsberg's 2005 examination bolsters Dr. DePace's findings. Despite Plaintiff's claims of hearing voices, Dr. Ginsberg indicated that Plaintiff had evaded a reality-testing question, and he reported that Plaintiff showed "no frank signs of delusional thought or obsessive behaviors[.]" Tr. 173. The ALJ's consideration and evaluation of Dr. Valentin's opinion comports with substantial record evidence.

Plaintiff also attributes error to the ALJ's discounting Dr. Valentin's opinion in part because the record contained only his opinion letter and his Medical Source Statement and did not contain treatment notes in support of his findings. Plaintiff admits that the lack of treatment notes makes the record unclear as to how often Dr. Valentin saw Plaintiff and whether any additional treatment notes exist. Pl.'s Br. 29. She claims, though, that the ALJ should have asked Plaintiff or her counsel about such additional records. *Id.* at 29–30. Citing generally to 20 C.F.R. §§ 404.1512(e), 416.912(e)(1), and 404.1527(d), Plaintiff argues that the ALJ "should have inquired as to the status of any treatment records from Dr. Valentin" and suggested that, if the ALJ did not believe Dr. Valentin to be aware of the other evidence regarding Plaintiff, "he should have contacted Dr. Valentin in regard to this issue." Pl.'s Br. 29–30; *see* Tr. 24.

The Commissioner responds that Plaintiff's counsel had ample time to obtain the treatment notes. Def.'s Br. 14.

The court does not agree with Plaintiff's claim that the ALJ had a duty to inquire about Dr. Valentin's treatment notes. As explained in another decision from this district, the "regulations impose a duty to recontact a treating physician only when the record is inadequate to make a determination of disability." *Jackson v. Barnhart*, 368 F. Supp. 2d 504, 507, n.1 (D.S.C. 2005) (Duffy, J.). Here, though, the ALJ did not suggest the record was insufficient for him to reach a decision as to Plaintiff's disability status. The ALJ found ample record evidence upon which to base his finding that Plaintiff was not disabled. The court finds that substantial evidence supports that finding. The ALJ was not required to contact Dr. Valentin in this instance.

Plaintiff's challenges to the ALJ's consideration of Dr. Valentin's opinion are without merit. Plaintiff's second and final allegation of error should be dismissed.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court finds that the Commissioner performed an adequate review of the whole record, including evidence regarding Plaintiff's mental and physical conditions, and the decision is supported by substantial evidence.

Accordingly, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under Section 205(g), sentence four, and Section 1631(c)(3) of the Act, 42 U.S.C.

Sections 405(g) and 1383(c)(3), it is recommended that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

July 27, 2010                                Shiva V. Hodges
Florence, South Carolina                     United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**